# In the United States Court of Federal Claims

No. 00-617C
(Re-issued: September 7, 2006)[1]

* * * * * * * * * * * * * * * * * * * * *

CHARLES CARLSEN, *et al.*,

                    *Plaintiffs*,

v.

THE UNITED STATES,

                    *Defendant*.

Motion for Summary Judgment; Overtime Pay; Federal Employees Pay Act; 5 U.S.C. § 5542; 5 C.F.R. § 550.111; Written Orders for Overtime

* * * * * * * * * * * * * * * * * * * * * *

    *Alan Banov*, Washington, D.C., argued for plaintiffs.

    *Domenique Kirchner*, Trial Attorney, Commercial Litigation Branch, Department of Justice, Washington, D.C. argued for defendant. With her on the briefs were *Robert D. McCallum, Jr.*, Assistant Attorney General, *David M. Cohen*, Director, *Kathryn A. Bleecker*, Assistant Director, *Nicole Heiser* and *Erika Turner*, Bureau of Prisons, Washington, D.C., as of counsel.

## OPINION

BRUGGINK, *Judge*

    This action involves defendant's motion for summary judgment and plaintiffs' cross motion for partial summary judgment with regard to the

---

    [1]This opinion was first filed on August 25, 2006, under seal. The parties made minor redactions, reflected herein by three consecutive asterisks.

Federal Employees Pay Act ("FEPA")[2] overtime claims of the four remaining plaintiffs. Defendant asserts that plaintiffs' failure to timely answer a request for admission deems the statements admitted. In the alternative, defendant claims that plaintiffs cannot meet the overtime compensation requirements of FEPA and its corresponding regulations, as applied by the Federal Circuit in *Doe v. United States*, 372 F.3d 1347 (Fed. Cir. 2004) ("*Doe II*"), which required plaintiffs to have written orders or approvals for overtime. Plaintiffs claim that *Doe* does not apply to them, and in the event that it does, they have proper written orders and approvals for overtime. This case has been fully briefed and was orally argued concurrently with *Bishop v. United States*, __ Fed. Cl. __, No. 03-446C (Aug. 9, 2006).[3] It is now ready for disposition. For the reasons set forth below, defendant's motion for summary judgment is granted and plaintiffs' cross motion is denied.

BACKGROUND[4]

This case is one of many currently before the court involving the claims of employees in various positions within the Bureau of Prisons ("BOP") for compensation due for unpaid overtime. Each of the four remaining plaintiffs in this case, Charles Carlsen, Jr., John Damico, Lourdes Natal, and John Tucker, are seeking backpay for alleged overtime performed for the period beginning April 19, 2000,[5] through the resolution of this case or the termination of their employment with BOP. Plaintiffs each hold a different

---

[2]As amended, 5 U.S.C. § 5542 (2000).

[3]An opinion was issued under seal in *Bishop v. United States*, a companion BOP case, on August 9, 2006. A public version will be issued shortly. Because the applicable law is the same in both cases, in many instances the legal arguments are given in more detail in *Bishop* and adopted herein by reference. For a full understanding of the legal analysis of this case, refer to *Bishop* as well.

[4]The facts are drawn from the plaintiffs' and defendant's proposed findings of uncontroverted fact as well as the appendices to their briefs. No material facts are in dispute.

[5]Plaintiffs entered into a Stipulation of Dismissal in *Adams v. United States*, Nos. 97-140C and consolidated cases, for all claims prior to April 18, 2000. These cases are referred to herein as "*BOP II*."

position within BOP, and, therefore, each plaintiff brings forth a different set of facts and evidence. We will address the facts regarding each plaintiff in turn.

Mr. Charles E. Carlsen, Jr.

Charles Carlsen was a GS-12 employee with BOP at the Federal Corrections Institution ("FCI") in Otisville, New York, from 1980 until his retirement on May 3, 2002. During the period April 19, 2000, through his retirement, Mr. Carlsen served in two different positions. He was an Employee Development Manager until he was reassigned as a Human Resources Specialist, effective September 23, 2001.

A large portion of Mr. Carlsen's duties involved the preparation and maintenance of various training programs for the institution. Mr. Carlsen scheduled and coordinated training sessions for at least eighteen training programs at FCI-Otisville. Though Mr. Carlsen did not prepare the lesson plan or conduct the training himself, he was usually responsible for setting up and breaking down the location used for these training sessions. Once the training schedule was prepared, it had to be submitted to the Warden for approval.

Mr. Carlsen claims overtime for duties he had to perform prior and subsequent to his scheduled shift. These preliminary and postliminary duties varied daily depending on whether any training was scheduled for that day. On days that Mr. Carlsen was not responsible for setting up a training session at the beginning of his shift,[6] he reported to and worked in his office most of the day. On these office days, Mr. Carlsen was scheduled to work from 7:30 am to 4:00 pm.[7] Mr. Carlsen alleges that he arrived at the institution before 7:15 am, in order to complete his morning tasks before the Warden arrived, although neither the Warden nor anybody else instructed him to do this. Most

---

[6]There are a number of reasons that Mr. Carlsen may not be responsible for a training session on a given day. The person conducting the training may handle the set-up and breakdown of the training area, training may not coincide with the beginning and end of Mr. Carlsen's shift, or there may be no training scheduled for that day.

[7]The only time Mr. Carlsen's schedule varied was when he served as a duty officer. He does not claim overtime for his preliminary or postliminary activities as a duty officer.

days, he would arrive and pick up his keys and radio from the Control Center around 7:00 am.  Then, he would walk to his office to turn on his computer and check sentry.  According to a timing estimate calculated by BOP,[8] his walk from the Control Center to his office took just under three minutes.  When Mr. Carlsen moved offices in 2001, however, his walk was shortened to approximately thirty-five seconds.  Mr. Carlsen would then go to the Lieutenants' Office to read the Lieutenants' Reports[9] and sometimes attend the lieutenants' meetings.  Other days, he assisted with mainline[10] before returning to his office for the beginning of his shift.  Mr. Carlsen alleges that he also had to arrive early on days when he had to attend department head meetings which started promptly at 7:30 am.  Mr. Carlsen stated in a deposition that he never received an oral or written order to perform pre-shift overtime.

Mr. Carlsen states that at the end of his office days he could not leave the institution until a "good verbal count" of the prisoners had been completed. At 3:45 pm each afternoon, officers took a count of the prisoners to verify that all inmates were accounted for.  If they came up with the correct number of inmates, it was called a "good verbal count."  If not, it was a bad count and they would try a second time.  Sometimes the count would last beyond 4:00 pm, the end of Mr. Carlsen's shift, and he would not leave the institution until it was finished.  Mr. Carlsen claims he would leave at 4:10 pm, at the earliest, after the count was completed.  There is no documentary evidence that Mr. Carlsen was directed to stay under these circumstances.  Nor have plaintiffs cited a rule that employees getting off shift must remain in the building until a good count is completed.

Mr. Carlsen's largest overtime claims originate from the pre- and post-shift work he performed when he was responsible for opening up and closing

---

[8]BOP used a stopwatch to estimate the walking time between the Control Center and various locations within the institution.  Plaintiffs have not offered alternative timings or contested most of these figures.

[9]Although Mr. Carlsen was only required to read Lieutenants' Logs at some point during his shift, he alleges it was necessary to arrive at the institution and review the logs and other pertinent information before his supervisor arrived.

[10]This is the term used to describe inmate mealtime.

down training sessions, which began at 7:30 am and ended at 4:00 pm.[11]  Mr. Carlsen was usually responsible for preparing the training location in advance and breaking it down afterwards.  For the 7:30 am training sessions, Mr. Carlsen alleges that he arrived at the institution around 7:00 am or 7:10 am. He would park in the general parking lot and then enter the secure portion of the institution to go by the Control Center.  Although Mr. Carlsen had a 24-hour key to the Training Center, he would usually stop by the Control Center to pick up a radio and any additional keys he may need for that specific training session.  He would then exit the secure perimeter, return to his private vehicle, and drive the approximate 1/4 mile to the center.  Mr. Carlsen would park in front of the building and unlock the Training Center.  After he was finished setting up all of the necessary supplies and electronic equipment, he usually opened the doors for the staff between 7:20 am and 7:30 am.  At that point, Mr. Carlsen would drive back to the main parking lot, re-enter the secure perimeter, and return to the Control Center for his office keys.  He then walked to his office and went about his normal daily routine.

Mr. Carlsen alleges that, on those days in which training involved firearms, his work began even earlier.  On those days, he had to arrive around 6:45 am in order to have everything prepared for the 7:30 am training session. Mr. Carlsen's subordinate, Mr. Larry Coe, assisted in setting up these sessions. They had to drive to the armory to get the weapons, open the firing range, and prepare the Training Center.

After his normal daily duties, Mr. Carlsen had to exit the secure perimeter and return to the Training Center at or before 4:00 pm.  He waited for the trainees to collect their things and leave after the training ended.  Then he would make sure confidential papers and training materials that were left behind were disposed of, the computer equipment was secured, and the refrigerator locked.  Mr. Carlsen would call to alert the proper personnel that the center was ready for the inmate cleaning crew.  He would then drive back and re-enter the secure portion of the institution and return equipment to the Control Center, if he had not done this before going over to the Training Center.  If a good count had been completed, he would leave the institution. Mr. Carlsen claims that he did not leave on these training days until approximately 4:30 pm.  When the training involved firearms, Mr. Carlsen and

---

[11]A large portion of the training sessions did in fact run from 7:30 am to 4:00 pm, the same exact hours of Mr. Carlsen's shift.

Mr. Coe also had to return the firearms to the armory and close the firing range.  On those days, Mr. Carlsen alleges that he did not leave the institution until approximately 4:45 pm.  Mr. Carlsen once again admits, however, that his supervisors did not order him to work overtime to complete these tasks and no writing exists telling him to perform this work before or after his shift.

Mr. Carlsen's last claim for overtime concerns the Warden's close-out meetings that he had to attend when serving as an Acting Associate Warden.[12] According to the declaration of Associate Warden Wilner and the deposition of Warden Menifee, Warden Menifee held these meetings Tuesday through Friday at 3:00 pm.  Def. Supp. App. 343 (Dep. of Menifee), 378 (Decl. of Wilner).  Mr. Carlsen alleges that he received e-mail reminders about attending these meetings.  The meetings were scheduled to last one hour, but would sometimes last beyond 4:00 pm.  Mr. Carlsen claims that he remained at these meetings when they ran beyond his shift, but that he did not receive extra compensation.

Mr. Carlsen claims that BOP owes him overtime pay for his work preparing for and breaking down training activities at the FCI-Otisville Training Center.  He also claims that his time spent on work tasks before and after his regular shift and the additional time spent at executive closeout meetings after the end of his shift constitute overtime.  Mr. Carlsen estimates that he averaged a total of at least thirty minutes of pre- and post-shift overtime each day.  Mr. Carlsen never asked for overtime pay or compensatory time in exchange for his time spent performing these activities.

Mr. John T. Damico

John Damico began his work for BOP in 1978.  For the relevant claim period, he served as a Laboratory Bench Supervisor at the Medical Center for Federal Prisoners ("MCFP") in Springfield, Missouri; his post was the laboratory.  His relevant claims begin on April 19, 2000, and end on his retirement date, March 30, 2001.  During the claim period, Mr. Damico worked two shifts, alternating by month with the other Laboratory Bench Supervisor; he worked 6:00 am to 2:30 pm or 8:00 am to 4:30 pm.  The two

---

[12]Defendant claims that these allegations are irrelevant because Mr. Carlsen never served as an Acting Associate Warden during the relevant claim period, but defendant offers no proof of such allegation.

Bench Supervisors always overlapped from 8:00 am to 2:30 pm.  Mr. Damico claims overtime for duties he had to perform prior and subsequent to his shift and for attending meetings that ran beyond his shift.

Mr. Damico claims that he had to arrive thirty minutes early to complete preliminary activities before the start of his shift.  Like all other employees, Mr. Damico had to enter the secure institution through two sally port doors. He would then proceed to the Control Center to pick up equipment or to ensure that somebody had picked it up before him.  Usually, he picked up the duty pouch when he had the 6:00 am shift and the yard key when he had the 8:00 am shift.  Mr. Damico states that it took him between five and ten minutes to obtain equipment.  He walked down a stairwell and through a door to reach the laboratory.[13]  BOP timed this walk.  It takes forty-seven seconds to walk from the Control Center to the laboratory.[14]  Mr. Damico claims that once he reached the laboratory he had to perform tool inventory, syringe and needle inventory, and review overnight lab requests before his shift started.  Although Mr. Damico does not cite to any explicit written documentation of this alleged overtime requirement, he claims that his supervisor, Ms. Trudy Eastman, verbally ordered him to be in the laboratory and ready to work by the start of his shift.

Mr. Damico and other plaintiffs in this case make claims for the time it took to perform  preliminary duties in order to be at their posts by their shift start time.  It is important to understand, however, that official BOP policy did not require these employees to be at their posts at the beginning or the end of their shifts.  The BOP issued Operations Memorandum 214-95 in 1995 to address this issue.  The memorandum stated: "An institution employee whose shift starts at 7:30 a.m. must be at the Control Center and have received his/her equipment no later than 7:30 a.m. to be considered 'on time' for the start of his/her shift."  It also stated that employees returning keys or equipment to the Control Center should be doing so at the official ending time of their shift. The memorandum called for institutions to ensure that employees spent minimal time waiting in lines to receive keys and stated that if an employee arrived in a reasonable time to pick up equipment, but did not receive the equipment by the start of his or her shift due to a line, then that employee

---

[13]Occasionally, the door was locked and he returned to the Control Center to radio an escort officer to unlock it.

[14]Plaintiffs do not dispute this figure.

would still be considered on time.   Def. Supp. App. 173 (Operations Memorandum 214-95, November 1, 1995).  These policies were incorporated into the Human Resources Management Manual by Change Notice 3000.02, issued on April 16, 1996, and are still currently in place throughout all BOP institutions.

Mr. Damico also claims that he left twenty to twenty-five minutes after his shift each day.   Ten to fifteen minutes of that time he spent in the laboratory performing needle and syringe inventory and informing the other Laboratory Bench Supervisor of pending lab work (this was only necessary when Mr. Damico worked the earlier of the two shifts).   He sometimes performed inventory before the end of his shift, if he had time.  Mr. Damico then reversed his travel, taking about ten minutes to drop off work equipment at the Control Center and exit the institution.

Mr. Damico also alleges that he had to work beyond his shift without compensation when he filled in at meetings for his supervisor. Ms. Eastman served on the Blood Utilization-Tissue Review Committee and the Central Safety Committee.  Frequently, if she could not attend a meeting, Mr. Damico would fill her spot.   Mr. Damico claims that during his claim period he attended four to six of these meetings.  They started at 1:00 pm and typically ran ten to fifteen minutes beyond his 2:30 pm shift ending time.  Plaintiffs offer no written proof that he attended these meetings or of their adjournment times.

Ms. Lourdes Natal

Lourdes Natal began her employment with BOP on September 5, 1982. Also a plaintiff in the *BOP II* settlement, Ms. Natal's claims begin on April 19, 2000, and continue through the present time.  She continues to serve as a GS-11 Supervisory Clinical Nurse at the MCFP in Springfield, Missouri.  Ms. Natal has worked all three daily Supervisory Clinical Nurse shifts: 12:00 am to 8:00 am; 7:30 am to 4:00 pm; and 4:00 pm to 12:00 am.

Ms. Natal claims pre- and post-shift overtime for the 7:30 am to 4:00 pm shift.  Ms. Natal alleges that a previous supervisor, no longer with BOP, told her to be at her work station, rather than in the key line at the Control Center, at the start of her shift.  She claims that she arrives at the institution twenty to twenty-five minutes before the start of her shift to go from the parking lot to the institution, pick up keys and a radio from the Control

Center,[15] take the elevator or stairwell, and report to her station.  The walk to her duty post ranges from forty-seven seconds to four minutes and twenty-five seconds, depending on where she is stationed for the day.[16]  Because Ms. Natal does not overlap shifts with a relief worker for the end of this shift, she claims that she has to stay five to fifteen minutes after her shift to brief her relief and exchange equipment. Ms. Natal then proceeds to the Control Center to return any equipment she did not exchange and exits the institution.

Ms. Natal claims that when she works the 4:00 pm to 12:00 am shift or the 12:00 am to 8:00 am shift she arrives at least fifteen to twenty minutes before her shift to perform the aforementioned tasks in order to be at her post by the beginning of her shift.  Ms. Natal makes the same five to fifteen minute post-shift claim regarding her 4:00 pm shift as she does with her 7:30 am shift. After the 12:00 am shift, however, Ms. Natal claims she leaves the institution by 8:05 am because her relief overlaps her by half an hour.

Ms. Natal also claims that sometimes her post-shift overtime lasts even longer when emergencies arise at the end of her shift.  While Ms. Natal alleges that this could happen up to three times per week, she offers no documentation of such past incidents.  In the one example she does cite, she was given overtime compensation.

Mr. John Tucker, Sr.

John Tucker claims overtime compensation for his time as a Lieutenant at the MCFP in Springfield, Missouri, from April 19, 2000 to January 13,

---

[15]Sometimes she receives these items from the nurse she relieves.

[16]There is a dispute as to whether Ms. Natal always serves at the same post throughout her claim period, or whether she serves at nursing offices in different buildings and the Dialysis Unit.  The BOP, however, timed walks from the Control Center to various places and found the times for the following locations: 1) to the Nursing Office in One Building- 47 seconds; 2) to the Nursing Office in Ten Building- 4 minutes, 25 seconds; and 3) to the Dialysis Unit- 1 minute, 33 seconds.  Plaintiffs do not offer alternatives to these timed figures.

2002, when he was reassigned to a bargaining unit position.[17]  Mr. Tucker was a GS-9 Lieutenant during the claim period and was supervised by Captain Jon Roberts and Warden Billy Hedrick.

Plaintiff Tucker served in several different lieutenant assignments and shifts during the claim period.  For the most part, he worked as an Activities Lieutenant in either the AM–6:00 am to 2:30 pm–shift or the PM–2:30 to 10:30 pm–shift.  For one quarter during the claim period, June 18, 2000 through September 16, 2000, he was scheduled to work as a Shift Relief Lieutenant, which required him to rotate lieutenant positions depending on who was off duty.

During his time as a lieutenant, Mr. Tucker received post orders that set out the duties of his specific position and shift.  Post orders are facility-based quarterly documents which offer guidelines to lieutenants to inform them of what needs to be done during their shift.  Captain Roberts issued and signed the post orders for the various lieutenant shifts.  Lieutenants also had to sign them to acknowledge that they had seen the duties for the shift.  For example, when Mr. Tucker worked as an Activities Lieutenant on the AM shift, he was subject to the following post order during the quarter beginning March 12, 2000:

| | |
|---|---|
| Hours of Duty: | 6:00 AM to 2:30 PM |
| Equipment: | Key chits, radio, hand cuffs. |
| Normal Routine: | All times are approximate.  At the Control Center exchange key chit for Key Set * * *.  Verify key count against key tag.  Make your presence known to the Operations Lieutenant and receive any pertinent information. |
| | REFER TO THE GENERAL ORDERS AND SPECIAL INSTRUCTIONS SECTION OF THE POST ORDERS. |

---

[17]Defendant claims that plaintiff Tucker served his last day as a Lieutenant on October 4, 2001, and therefore his claim should exclude any days beyond that date.  *See* Def. Supp. App. 460-70.

* * *

6:00 AM                 Report to the dining room and assist
                        supervising the feeding of the morning
                        meal.

7:30 AM                 Report to the inner foyer area and assist
                        the Control Center Officers identify staff
                        and and [sic] observe movement in and out
                        of the institution.

* * * * *

2:30 PM                 End of Duty.   Pass on any pertinent
                        information concerning your area to your
                        relief.  You are now relieved of duty.

Pl. Supp. App. 330-31.

        When plaintiff Tucker served as an AM Activities Lieutenant, he claims
that he arrived at approximately 5:30 am, a half hour before the beginning of
his shift, to accomplish those activities listed on the post order ahead of 6:00
am.   Plaintiffs claim that Mr. Tucker was responsible for completing
everything in the "normal routine" section before being required to "report to
the dining room" *at* 6:00 am.  Mr. Tucker states that each morning he entered
the institution through the sally port doors, went to the Control Center and
waited in line to pick up equipment such as keys and a radio.  He continued on
to the Lieutenants' Office,[18] made his presence known to the Operations
Lieutenant and received any pertinent information, reviewed Lieutenants'
Logs, prepared to deal with incident reports, and then finally reported to the
dining room by 6:00 am.[19]

_____

        [18]The BOP timed the walk from the Control Center to the Lieutenants'
Office with a stop watch and found that the walk takes approximately three
minutes and twenty-one seconds.  Plaintiffs accept this timing but also aver
that the walk could take up to five minutes.  The five minute estimate offered
by plaintiffs is solely based on the deposition testimony of Mr. Tucker, not on
any measured timings.

        [19]The BOP found that it took one minute and thirty seconds to walk
                                                            (continued...)

11

Mr. Tucker claims that he did not leave his post at the end of his shift until he had briefed his relief and exchanged equipment or chits[20] with that lieutenant. He claims that sometimes he also had to finish filling out incident reports before he left. He then walked from the Lieutenants' Office to the Control Center and exited the institution. According to Mr. Tucker, all of these activities happened after the end of his shift at 2:30 pm and he did not leave the institution until 2:40 or 2:45 pm.

When Mr. Tucker worked the PM Activities Lieutenant shift, he claims he arrived at the institution between 2:15 and 2:20 pm for his 2:30 pm start time. He entered the institution and went by the Control Center to pick up keys or chits and equipment and then reported to the Lieutenants' Office to check in with the Operations Lieutenant on duty.[21] The post orders applicable during the claim period required Mr. Tucker to pick up keys, make his presence known to the Operations Lieutenant, and receive pertinent information. The PM shift post orders differ from those discussed above, however. The first time listed on the post order with adjacent activities is 2:50 pm, twenty minutes after the start of the shift. Additionally, the PM shift post orders also stated that "all times are approximate."

Plaintiff Tucker also claims ten to fifteen minutes of overtime after the end of his PM Activities Lieutenant shift. Although Mr. Tucker did not have to exchange information at this time because there was no relief coming in to replace him, he had to go to the Control Center to return equipment. He then

---

[19](...continued)
from the Lieutenants' Office to the Food Service Department. It is unclear, however, if the dining room is located within this department area.

[20]The parties describe a chit as a small piece of plastic or metal that identifies an employee by name or number. Employees were to leave their chits at the Control Center in place of any keys or equipment so the Control Center would know who was responsible for that set of keys or piece of equipment.

[21]Defendant claims that Mr. Tucker did not have to stop at the Control Center to obtain keys, instead, he was to receive them from the AM Activities Lieutenant. We assume he still had to stop at the Control Center, however, to pick up the AM Activities Lieutenant's chits.

exited through the two sally port doors.  Plaintiff Tucker typically left the institution between 10:40 and 10:45 pm.

Plaintiff Tucker claims that he worked as a Day Watch Operations Lieutenant one day per week between June 18, 2000 and September 16, 2000. The Day Watch Operations Lieutenant shift began at 7:30 am and ended at 4:00 pm, with an additional half hour scheduled into it for a duty-free lunch. On the Day Watch shift, Mr. Tucker relieved the Morning Watch shift, which ran from 12:00 am to 8:00 am.  These lieutenants had a half hour overlap in which to exchange equipment and briefing.  At the end of the shift, Mr. Tucker was relieved by the Evening Watch Operations Lieutenant, a 4:00 pm to 12:00 am shift.  They had no overlap time in which to perform the duties that required them both there at the same time.

Mr. Tucker alleges that he adhered to the post order requirements and picked up a battery and reviewed Lieutenants' Logs prior to reporting to duty at 7:30 am.  Mr. Tucker also claims post-shift overtime for the time he spent passing on keys, a radio, and pertinent information to his relief as well as exiting the building.  It is unclear, however, what the post orders during this time required him to do, because orders for this lieutenant position were only submitted for 1997, 1998, and the quarter beginning October 24, 2000.  None of this time falls within his claim period for Day Watch Operations Lieutenant.

Defendant also points out that Mr. Tucker only served in this position seven times during the claim period.  Def. Opp. 25 (citing Def. Supp. App. 461, 464).  It relies on a chart attached to the Declaration of Greg Baysinger, the current Captain at MCFP Springfield, for these dates.

Finally, Mr. Tucker claims that he worked beyond the hours of his shift when he had to stay late to complete reports of incidents[22] or to conduct correctional audits.  Pl. Supp. App. 380.  Plaintiff Tucker does not, however, offer dates, amounts of time spent, or any written proof of this claimed

---

[22]According to defendant, based on the BOP Program Statement, the incident reports that plaintiffs claim must be filled out before the end of the "tour of duty" are only required when "staff apply physical restraints necessary to gain control of an inmate who appears to be dangerous."  They are not necessary when restraints are applied for general use, such as movement or transfers of inmates.  Def. Opp. 28 (quoting Pl. Supp. App. 351, 354).

overtime.  Mr. Tucker also fails to offer any type of substantial claim or proof that he was required to work through his half hour lunch break, as he alleges.

DISCUSSION

## I.  Summary Judgment Is Appropriate

Both parties agree that summary judgment is appropriate.  Under the Rules of the Court of Federal Claims ("RCFC") 56(c), a moving party is entitled to summary judgment if it can demonstrate, based on the pleadings, that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001).  Because no dispute of material fact exists on these claims, it is proper to decide them on summary judgment.

## II.  Motion to Deem Certain Matters Admitted Is Denied

Defendant argues that plaintiffs' failure to timely answer a "Request for Admission" by October 22, 2004, amounts to an admission, under RCFC 36(a).[23] Defendant argues that, due to the failure to timely respond, plaintiffs are admitting to the absence of a FEPA violation and, therefore, all evidence to the contrary should be ignored.  Defendant asserts that by answering the requests late, without requesting an enlargement of time, and by failing explicitly to deny the admission, plaintiffs admitted that they were "not ordered or approved in writing to work overtime for BOP, without receiving either compensatory time or overtime pay for such overtime work."  Def. Mot. Summ. J. 4 (quoting Def. App. 10-17, 65-72, 84-91).

----

[23]RCFC 36(a), in relevant part, states:

The matter is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow or as the parties may agree to in writing, subject to RCFC 29, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney.

14

As we held in our August 2, 2005 order in *Aaron v. United States*, No. 00-315C, and consolidated cases, though plaintiffs' tardiness in submitting an answer creates grounds to accept defendant's motion to deem these matters admitted, deeming the lack of claims admitted is an extreme penalty. Plaintiffs' responses were filed on various dates within a couple of months from the due date. While we do not condone plaintiffs' failure to adhere to deadlines, defendant has not been prejudiced by this delay. We decline to deem the late response as a concession of liability.

### III.  Impact of *Doe v. United States*

Defendant argues that plaintiffs cannot meet their burden of proof to demonstrate that BOP violated FEPA. Defendant relies on the 2004 Federal Circuit decision in *Doe II* to establish their legal defense to these claims. In *Bishop v. United States*, another BOP summary judgment decision issued in close relation with this one, we examine *Doe II* in some detail. We explain it only briefly here.

Department of Justice ("DOJ") attorneys brought a class action suit against the United States for overtime violations of FEPA. This court held the government liable for compensation for all overtime beyond plaintiffs' forty hour work weeks. *Doe v. United States*, 54 Fed. Cl. 404 (2002) ("*Doe I*"). On interlocutory appeal, however, the Federal Circuit reversed. It held that the applicable Office of Personnel Management ("OPM") regulation[24] required overtime to be "ordered or approved . . . in writing by an officer or employee to whom this authority has been specifically delegated." 5 C.F.R. § 550.111(c). In *Doe II*, the court overturned a previous line of cases, beginning with *Anderson v. United States*, 136 Ct. Cl. 365, 393 (1956), which had previously held that orders or approvals for overtime did not have to be in writing to be compensable, irrespective of what the regulation required. The court found that the Supreme Court's decision in *Scheiker v. Hansen*, 450 U.S. 785 (1981), was inconsistent with those decisions and effectively overruled them. The parties in that action were also arguing over the applicability of a regulation

---

[24]In 1945, OPM's predecessor, the Civil Service Commission adopted this regulation and OPM has since upheld it. It states, in full: "Overtime work in excess of any included in a regularly scheduled administrative workweek may be ordered or approved only in writing by an officer or employee to whom this authority has been specifically delegated." 5 C.F.R. § 550.111(c) (2005).

with a writing requirement. The Court held that "a court is no more authorized to overlook the valid regulation requiring that applications be in writing than it is to overlook any other valid requirement for the receipt of benefits." *Hansen*, 450 U.S. at 790. Based on *Hansen*, the Federal Circuit held in *Doe II*, that a "writing requirement was not invalid simply because it added an additional procedural requirement to the substantive requirements of the statute." 372 F.3d at 1356.

The Federal Circuit then evaluated and rejected the various documents submitted by DOJ attorneys as alleged orders or approvals for overtime. The Federal Circuit gave two reasons for why the documents did not meet the requirement for a writing approving overtime. First, the documents were written by someone other than an official with the properly delegated authority to order or approve overtime. Second, the documents neither directed plaintiffs to work any amount of overtime nor directed them to work an indefinite number of overtime hours. The appellate court reversed and directed this court to enter summary judgment for defendant.

After we entered summary judgment for the government, plaintiffs filed a motion for reconsideration. We found that the Federal Circuit's decision that "knowledge, encouragement, and inducement by management or supervisory personnel do not authorize overtime pay" precluded the remainder of plaintiffs' claims and therefore all issues had been decided by previous opinions. *Doe v. United States*, 63 Fed. Cl. 798, 804 (2005) ("*Doe III*").[25]

---

[25]Plaintiffs here argue that application of *Doe II* would be unconstitutional as a deprivation of their due process rights. In support, they rely on *Landgraf v. USI Film Products*, 511 U.S. 244, 265-66 (1994), which expresses the Court's disfavor toward retroactive legislation. This citation and the corresponding concern are irrelevant. *Doe II* was interpreting legislation and regulations which pre-dated the overtime claims at issue. Plaintiffs' real concern here is different: that the Federal Circuit was clarifying the law in a "new way" to the prejudice of plaintiffs. This is neither factually correct nor legally relevant. The court was obligated to announce the law as it exists. The fact that it overruled a line of decisions which held a competing view of the regulation at issue is not material.

16

## IV.  Distinguishing *Doe v. United States*

Plaintiffs contend that the present facts are distinguishable from *Doe II*. These arguments are nearly identical to those brought by plaintiffs and rejected by us in *Bishop*.[26]   Plaintiffs also argue that they have sufficient written documentation to satisfy the requirement of the OPM regulation and *Doe II*.

### A.  Distinguishing BOP Employees From DOJ Attorneys

Plaintiffs advance several bases for distinguishing *Doe II*: 1) unlike BOP employees, DOJ attorneys are professionals who operate independently; 2) BOP employees work in a more secure, dangerous environment; 3) the Bureau's mission necessitates rigid work scheduling; 4) Congress recognizes that law enforcement employees are unique; 5) it is difficult to schedule overtime in advance in the BOP; 6) the BOP discourages requests for overtime; 7) BOP employees must follow orders, whether oral or written; and 8) plaintiffs received direct overtime orders in writing.[27]

As the first seven of these factors do not survive *Doe II*, it is unnecessary to address them here.[28]   The only basis on which plaintiffs can proceed is by offering direct, written orders by authorized officials to work overtime.

---

[26]In *Bishop*, we held that *Doe II* was indistinguishable and therefore applied to BOP employees.  In examining evidence the plaintiffs offered to meet the requirement of a written order or approval for overtime, we rejected all of their arguments but one.  We found that post orders  requiring two lieutenants, one off-duty, to be there at the same time to exchange information and equipment constituted written orders for overtime.  Because some of Lt. Shea's post orders required this exchange at the beginning and the end of his shift, we reserved this issue for trial to determine if this was more than de minimis overtime.

[27]Plaintiffs also claim that applying *Doe II* would violate the purpose of FEPA to ensure overtime compensation.  This argument was the basis of the *Anderson* decision overturned by the Federal Circuit in *Doe II*.  372 F.3d at 1353, 1357.

[28]These factors were also discussed briefly and rejected in *Bishop*.

## B.  Plaintiffs' Written Orders For Overtime

Plaintiffs rely on the Program Statement, Standards of Employee Conduct, training materials, and other agency-wide documents.  They also offer more specific documents as proof that they were ordered to work overtime.  Defendant argues that these materials are insufficient under *Doe II*.

### 1. Documents Applying to All Plaintiffs

#### a.  Program Statement 3420.09, Standards of Conduct

Plaintiffs point, for example, to the Standards of Employee Conduct: "Employees are to obey the orders of their superiors at all times."  Pl. Supp. App. 214 (BOP Program Statement).  Plaintiffs argue that this statement from the Standards of Conduct requires them to follow the orders of their superiors, including oral orders to work overtime, or face possible discipline.

We do not question that BOP employees must follow orders.  Under *Doe II*, however, the only orders that lead to compensable overtime are those that explicitly order or approve overtime in writing.  A statement in a manual announcing to employees that they must follow the orders of supervisors does not amount to a written order to perform overtime.  This kind of bootstrapping we view as inconsistent with *Doe II*.  We therefore deny plaintiffs' claims for overtime based on the Standards of Employee Conduct.[29]

#### b. Training Lesson Plans and Agendas

Plaintiffs also offer the training lesson plans and the various documents given to employees during training as evidence of written orders for overtime.  These documents stress the necessity to obey orders and report to duty on time.  They also explain other basic policies such as key control and employee

---

[29]Plaintiffs offer various other arguments that employees were required to work overtime because of oral orders, such as an oral instruction to be *at* their duty post by the start of their shift, or that they had to attend certain meetings, or because BOP expectations required them to do something.  We find it unnecessary to address each of these arguments individually since they fail to meet the writing requirement of the OPM regulation, as applied by *Doe II*.

conduct. It is unnecessary to evaluate these documents in detail. Under *Doe II*, these documents cannot qualify as instructions to perform uncompensated overtime because they do not explicitly require work to be performed outside of normal shift hours.

### c. Rosters

Plaintiffs argue that daily, monthly, and/or quarterly rosters also serve as orders for overtime. We disagree. Rosters indicate the date and time certain employees begin and end work. These documents, however, do not require employees to perform any duties before or after their shifts and therefore do not act as written orders for overtime.

### d. Institution Supplements

Plaintiffs contend that Institution Supplements (institution-specific documents, approved by the Warden to provide further guidance of local regulations and policies) ordered certain employees to attend meetings. The FCI-Otisville Institution Supplement, for example, lists the various monthly meetings at the institution, their time, and their location. Plaintiffs argue that this list requires the attendance of certain employees at these meetings.

The Institution Supplement is not addressed to specific employees, however, and does not mandate attendance at the listed meetings. Nor does it direct that employees must attend meetings outside of their normal shift.

### e. E-mail Meeting Reminders

As in *Bishop*, plaintiffs here also argue that e-mails originating from the Warden's secretary reminding them about various meetings constitute written orders to perform overtime. The e-mails are directed at a list of recipients and refer to the particular meeting, and the time and date it will be held. Plaintiffs also argue that the weekly meeting schedules created by the Warden's secretary count as overtime orders. None of these documents explicitly order any employee to attend these meetings outside of their shift or to work overtime, however.

In sum, we do not find any of the general documents offered by plaintiffs to be sufficient proof of explicit written orders or approvals for overtime. Under *Doe II*, these documents "[did] not order [employees] to

work any amount of overtime–[they did] not even, as the plaintiffs contend, order an indefinite number of overtime hours." *Doe II*, 372 F.3d at 1363.  It is therefore unnecessary to consider if they were issued by persons authorized to order overtime.  We now will consider each individual plaintiff's documents in turn.

### 2.  Mr. Charles Carlsen, Jr.

### i.  Plaintiff Carlsen's Standing to Bring a FEPA Claim

Defendant argues that Mr. Carlsen, a GS-12 employee at his time of retirement, does not have standing to bring a FEPA claim.  BOP Program Statement 3000.02 states that employees receiving compensation at a GS-12 or above level "are required to take compensatory time off" instead of receiving overtime pay for "irregular or occasional overtime work."[30]  Def. App. 109-10.  Defendant argues that, based on a 1986 Claims Court decision and OPM's own interpretation of the statute and regulation allowing BOP to set this limitation, Mr. Carlsen is precluded from bringing a monetary claim because, even if entitled to overtime, it would only be compensatory time and he would not be entitled to a monetary judgment.  Such a declaration, according to defendant, would constitute equitable relief that is not within the power of this court to grant under the Tucker Act.  *See Jane Doe v. United States*, 372 F.3d 1308, 1312-13 (Fed. Cir. 2004) (citing *Lee v. Thorton*, 410 U.S. 139, 140 (1975)).

Plaintiffs argue that Mr. Carlsen's overtime was not "irregular or occasional" because he performed it everyday, and therefore the provision does not apply.  Plaintiffs also argue that Mr. Carlsen can liquidate his claim for compensatory time and turn it into a monetary claim.

It is unnecessary, however, to reach the merits of this argument.  As we explain below, Mr. Carlsen did not perform overtime that was expressly ordered or approved in writing.

---

[30]BOP has authority to implement this provision pursuant to 5 U.S.C. § 5543(a)(2).

### b.  Preliminary and Postliminary Office Day Duties

Plaintiff Carlsen argues that he worked beyond his shift during days in which no training was scheduled.  Mr. Carlsen alleges that he had to be in his office, with his morning activities in the Control Center and other parts of the institution complete, before the start of his shift.  Mr. Carlsen also argues that he remained at the institution beyond his shift, waiting to leave until a good verbal count was complete.  Mr. Carlsen offers no documentation that these alleged overtime tasks were ordered or approved by a supervisor.  Under *Doe II*, we cannot find that any of these claims suffice.  They are indistinguishable from claims in *Doe*, which the court characterized as inducement by supervisory personnel that is insufficient to authorize or approve overtime. *See Doe III*, 63 Fed. Cl. at 804.

### c.  Preliminary and Postliminary Training Duties

Mr. Carlsen also argues that he had to perform overtime on the days that training was held during his shift.  As discussed *supra*, Mr. Carlsen would prepare the training area before BOP employees showed up for the session beginning at 7:30 am, the same time as the beginning of his shift.  He would not be present during training.  He then returned at the conclusion of training, just before 4:00 pm, to secure equipment and documents before the inmates came to clean. Mr. Carlsen claims that at some point, too long ago for him to remember, someone told him to schedule training sessions to begin at 7:30 am and end at 4:00 pm.  He also claims that in 1991, before the claim period, the then-Warden, Greg Hershberger, orally instructed him to prepare the training area for the start of training before performing his other tasks in the main institution.

### i.  Training Schedule

Plaintiff Carlsen avers that the Warden-approved training schedule constituted an order to perform overtime before and after his regularly scheduled shift. Each training course required the creation of a lesson plan and schedule.  In most instances, Mr. Carlsen was responsible for creating this schedule, which included the beginning and end times for the training session. It was necessary for the Warden to approve the schedules before they were implemented.  Mr. Carlsen argues that the Warden's approval of a schedule with training beginning at 7:30 am acted as an order for him to "begin work at least one half hour earlier than his 7:30 am - 4:00 pm scheduled shift . . . so

he could prepare the training center before classes were held." Pl. Opp. at 30. Mr. Carlsen also argues that when training lasted until 4:00 pm, the schedule acted as an order for him to remain after his shift to secure the training area for inmate clean-up detail.

We disagree.  Approval of a training schedule does not explicitly order Mr. Carlsen to perform overtime.  While we do not disagree that the Warden may have been aware that implementing such a training schedule may require Mr. Carlsen to show up early and stay beyond his shift, "knowledge, encouragement, and inducement by management or supervisory personnel do not authorize overtime pay."  *Doe III*, 63 Fed. Cl. at 801.

### d.  Executive Closeout Meetings

Mr. Carlsen served briefly as Acting Assistant Warden.  He claims that during that time he was required to attend executive close-out meetings. Although the meetings usually began at 3:00 pm, on occasion they would last well beyond his shift.  Mr. Carlsen sometimes received e-mail reminders about these meetings from the Warden's secretary.  The Assistant Warden's secretary also usually gave Mr. Carlsen a schedule of the meetings he had to attend while he was filling in.  Mr. Carlsen no longer has any copies of these emails, schedules, or any other records of the time he spent at these meetings. Plaintiffs argue that the Warden attended these meetings and his knowledge that employees were staying late to complete the meeting meant that he "approved their attendance" and, therefore, overtime.

As we stated *supra*, e-mail reminders about and schedules of meetings do not serve as explicit orders to perform overtime, when those meetings are scheduled within the regular workday.  Additionally, as stated in *Doe III*, a supervisor's mere knowledge that employees stay beyond their shift to complete a meeting does not serve as an order or approval of overtime compensation.  63 Fed. Cl. at 804.

### 3.  Mr. John T. Damico

Mr. Damico claims that he was ordered to perform preliminary and postliminary duties that constituted uncompensated overtime.  He alleges that his Laboratory Supervisor required him to perform pre-shift duties in order to be at his post and prepared to start work by the beginning of his shift.  Mr. Damico also asserts that he had to attend meetings, in the absence of his

supervisor, and that he was not compensated when these meetings lasted beyond his shift.

### a. Preliminary and Postliminary Time

Mr. Damico usually arrived early and stayed late at the laboratory. Mr. Damico claims that this was because his supervisor expected him to be in the laboratory, not the key line in the Control Center, at the beginning and end of his shift. Plaintiffs state, "Mr. Damico did not <u>even have</u> to receive written orders to be in the laboratory at the start of his scheduled shift or not leave until the end of his scheduled shift because it was the Bureau standard that you <u>follow the orders</u> of your supervisors." Pl. Opp. 35. As discussed *supra*, oral orders, expectations and past practices, however, are insufficient to prove that an employee was ordered or approved for overtime under *Doe II*.

### i. Position Description

Mr. Damico also relies on his Position Description as a Laboratory Bench Supervisor. Plaintiffs argue that the "position description contained language, which Mr. Damico interpreted and implemented in his daily routine, which required him to conduct preliminary and postliminary work." Pl. Opp. 35.

Plaintiffs cannot point directly to a portion of the position description that requires Mr. Damico to come in early or stay after his shift or "work any amount of overtime." *Doe II*, 372 F.3d at 1363. Mr. Damico also concedes in his deposition that he never received written instructions to work overtime. We therefore find that this document does not order or approve overtime for Mr. Damico.

### b. Meetings

Plaintiff Damico claims that when he was the acting Laboratory Supervisor, in his supervisor's absence, he attended meetings that required overtime. Mr. Damico claims that his attendance at these meetings totaled between sixty and ninety minutes of overtime.

### i. Position Description

Mr. Damico once again points to the Position Description for Laboratory Bench Supervisor, which states that the Bench Supervisor "assumes responsibility for management of the laboratory in the absence of the Supervisory Medical Technologist." Mr. Damico interpreted this to mean that, when his supervisor was absent, he was to perform the usual function of his supervisor, including attending meetings.

As defendant points out, Mr. Damico stated in a deposition that he did not receive written instructions to attend these meetings. Further, he has no documentation of how much overtime he allegedly incurred at these meetings and he never previously requested compensation for this time. Mr. Damico, therefore, cannot prove that he served overtime by attending these meetings or that he was ordered to work overtime.

### 4. Ms. Lourdes Natal

### a. Preliminary and Postliminary Time

Ms. Natal claims overtime with regard to those tasks which she has to perform before and after her scheduled shift. These tasks include picking up keys and equipment and briefing a relief worker.

### i. Position Description

Ms. Natal, like her co-plaintiffs, bases her overtime claims on her position description. Plaintiffs state in their brief that the position description contains language which Ms. Natal interpreted and implemented in her daily routine to require her to conduct preliminary and postliminary work. For example, she interprets the statement, "staff correctional activities are paramount and precede other duties and responsibilities" to mean that her primary responsibility is to make herself aware of incidents occurring outside of her shift, learn about and prepare for potential issues, and ensure the safety of the institution and its inhabitants. Additionally, she claims that the statement "provides personal and professional example to all Nursing Department staff in performance of supervisory duties" to mean that "she is supposed to set an example for other Nursing Department staff, specifically her subordinates, by working at the start of her scheduled shift, staying late when necessary to ensure that her duties are complete for the work day, and

ensuring that she has passed on all pertinent information to her colleagues so that they are prepared for their shifts." Plaintiff Lourdes Natal's Proposed Findings of Uncontroverted Facts ("PFUF") 6. Plaintiff Natal also believes the position description requires her to hold meetings before and after her shift.[31] The position description also emphasizes that she is required to know supervisory and communication techniques that foster an organized and efficient nursing department. She claims that she accomplishes this by giving and receiving reports to and from her colleagues before and after her shift.

Ms. Natal admitted during her deposition that the position description did not explicitly direct her to work overtime. Ms. Natal also offers no further written proof that she was ordered to perform overtime. We are forced to conclude that Ms. Natal fails to present any evidence that she was ordered or approved in writing to perform overtime by an authorized official.

### 5. Mr. John Tucker, Sr.

### a. Preliminary and Postliminary Time

### i. Position Description

Plaintiff Tucker relies, in part, on his interpretation of the requirements of the GS-9 Lieutenant Position Description. Mr. Tucker claims that he interpreted the statement, "Security concerns are a regular and recurring part of the job," to mean that he had to arrive early enough to review the Lieutenants' Logs. He also felt it was necessary obtain additional information from an on-duty lieutenant or from the lieutenant he was relieving, otherwise he did not feel prepared for the shift and felt he would not be in compliance with the position description.

Plaintiff Tucker's interpretation of the position description is insufficient evidence that he was explicitly ordered in writing to perform overtime. On its own, the position description does not order Mr. Tucker to work any amount, definite or indefinite, of overtime.

---

[31]The Position Description states, "Factor 1 - Knowledge Required by the Position: Knowledge of supervisory theories and techniques required to facilitate the efficient and effective operation of the Nursing Department." Pl. Supp. App. 270.

### ii.  Correctional Services Manual

Mr. Tucker also avers that the description of the lieutenants' job requirements in the Correctional Services Manual constitutes a requirement to perform overtime.  Mr. Tucker, however, does not point to any specific portion of the manual that orders overtime.

### iii.  Post Orders

Mr. Tucker claims that he had to arrive early and stay late in compliance with post orders.  Plaintiffs and defendant argue over the meaning and purpose of these documents.   During depositions, post orders were described by various BOP employees as written instructions as to what needs to be accomplished and what is expected of certain individuals during their shift.  *See, e.g.*, Pl. Supp. App. 179 (Dep. of Billy Hedrick); Def. Supp. App. 573-77 (Dep. of William Ey).  The post orders list lieutenant activities adjacent to specific times.  Plaintiffs argue that these tasks have to be performed at or before the adjacent time listed on the page.  Plaintiffs further argue that all of the tasks listed at the top of the post order, under "normal routine," had to be accomplished before the beginning of the Lieutenant's shift.  Mr. Tucker claims that in order to complete the tasks listed on the post order, it was necessary for him to perform work before and after his scheduled shift.

Defendant offers testimony from various captains and wardens in the BOP system stating that post orders are guidelines to assist lieutenants in understanding their duties during their shift.  In fact, defendant offers Capt. Roberts' General Orders for lieutenants, issued on October 24, 2000, which state, "these Post Orders are meant as a guide." Def. Supp. App. 558.  In fact, almost all of the post orders state, "all times are approximate."  *See, e.g.*, Pl. Supp. App. 330-31.  Defendant also stresses the fact that in Mr. Tucker's case none of the Lieutenants' Logs indicate that he worked overtime.

When interpreting the meaning of the post orders, it is important to keep in mind the BOP Policy stating that shifts begin and end at the Control Center when employees have to stop there to pick up and drop off keys or equipment. Mr. Tucker was, therefore, supposed to obtain his keys at his shift starting time and was supposed to report to the Lieutenants' Office or the dining room as soon as possible thereafter.

Defendant argues that this BOP policy means that no tasks should occur before Mr. Tucker's shift.   For his AM and PM Activities Lieutenant assignments, Mr. Tucker should have been in the key line, or trying to exchange chits in the Control Center at 6:00 am or 2:30 pm, at a point when there should have been little or no key line, according to BOP officials. During deposition, Capt. Baysinger stated that the relaying of information from the outgoing lieutenant should have been minimal, only a couple of minutes, since most of the important facts would already be documented in logs that plaintiff could read during his shift.  Def. Supp. App. 460-65 (Decl. of Greg Baysinger).   We find that although post orders are binding, they do not explicitly order overtime, with the exception discussed below.

We are concerned with one type of post order which appears to explicitly require a lieutenant to work beyond his shift.  The Activities Lieutenant post orders, the only ones we have for Mr. Tucker for the relevant claim period,[32] require the AM shift and PM shift Activities Lieutenants to exchange information with one another.  In fact, the AM Activities Lieutenant Post Order states, "2:30 PM- End of Duty.  Pass on any pertinent information concerning your area to your relief.  You are now relieved of duty."  Pl. Supp. App. 333.   The PM Activities Lieutenant Post Orders include under the "Normal Routine" portion: "Make your presence known to the Operations Lieutenant and receive any pertinent information or special instructions."  Pl. App. 334.  In order for the outgoing lieutenant to brief the incoming lieutenant, these two employees have to be present at the same time, even though there is no overlap in their shifts.  It is unclear exactly how much time was needed for this briefing.

To be clear, the only overtime we find that these documents order is the time lieutenants on non-overlapping shifts must spend exchanging information. Based on the Activities Lieutenant post orders, there are only two Activities

---

[32]We only have relevant post orders for Mr. Tucker's shifts as AM and PM Activities Lieutenant.  We do not have post orders for the few days he served as an Operations Lieutenant, and therefore we have no basis for making a similar assessment for that shift.  Even if the relevant post order ordered overtime, the claim would probably be of a de minimis nature, as Mr. Tucker only worked the shift seven times during the entire claim period, and, the briefing between lieutenants, without an overlap of shifts, only occurred once at the end of this shift each time.

27

Lieutenant shifts per day. This means that there was only a need to brief a relief once a day as the outgoing AM shift lieutenant left and the oncoming PM shift lieutenant arrived. Overtime was thus only possible at 2:30 pm, the end of one shift and the beginning of another. Under this theory, Mr. Tucker is eligible for his postliminary overtime when he served as an AM Activities Lieutenant and his preliminary overtime when he served as a PM Activities Lieutenant.[33] For these shifts, Mr. Tucker only claims overtime for briefing time on the end of his AM Activities Lieutenant assignment, however. While Mr. Tucker does in fact claim that he arrived early for his PM Activities Lieutenant shift, he does not state that he did so in order to receive briefing from the outgoing AM Activities Lieutenant. Because Mr. Tucker had to stay after his AM Activities Lieutenant shift to brief his replacement, we can assume that it was common practice for the AM Activities Lieutenant to stay late to perform this function. Thus, to determine if Mr. Tucker's claim is compensable, we must consider whether the overtime on the end of Mr. Tucker's AM Activities Lieutenant shift qualifies as more than de minimis.

## V.     De Minimis Overtime

By regulation, pre- and post-shift activity that is "closely related to an employee's principal activities," and is "indispensable to the performance of the principal activities" is credited as hours of work if the total time spent on the activity is more than ten minutes. 5 C.F.R. § 550.112(b)(1)(i).[34]  By

---

[33]In *Bishop*, we also discuss the effects of the Portal-to-Portal Act, 29 U.S.C. § 251 et seq. (2000), and the Supreme Court's decision in *IBP, Inc. v. Alvarez*, 126 S. Ct. 514 (2005). We find it unnecessary to reiterate our findings in *Bishop* here. We note, however, although we did not discuss it in *Bishop*, that the regulation defining pre-shift and post-shift activities is applicable in this and all FEPA cases. It states that a "preshift activity is a preparatory activity that an employee performs prior to the commencement of his or her principal activities." 5 C.F.R. § 550.112(b). Conversely, it states post-shift activities are those performed subsequent to an employee's completion of all principal activities. *Id.* As discussed herein, Mr. Tucker's activities before his receipt of equipment, including chits, and his activities after turning over equipment are noncompensable under this regulation.

[34]5 C.F.R. § 550.112(b)(1)(i) states:

(continued...)

implication, therefore, the agency is not obligated to pay overtime when this work takes ten minutes or less.  This is known as the "de minimis rule."  *See Abrahams v. United States*, 1 Cl. Ct. 305 (1982) (applying the de minimis rule to plaintiffs' FEPA claims).  *See also Anderson v. Mt. Clements Pottery Co.*, 328 U.S. 680, 692 (1942) (defining de minimis as "a few seconds or minutes of work beyond the scheduled working hours"); *Baylor v. United States*, 198 Ct. Cl. 331(1972); *Ayres v. United States*, 186 Ct. Cl. 350 (1965).  Mr. Tucker must prove, therefore, that any preliminary or postliminary tasks in question took him more than ten minutes per day to perform.

The only written orders which pass scrutiny under *Doe* are post orders requiring the Activities Lieutenants to be present at the same time to exchange information before or after their shift. Mr. Tucker claims that he left the institution ten to fifteen minutes after the end of his AM shift.  Because he does not state that he arrived early on his PM shift to receive briefing, the briefing must have taken place after 2:30 pm (the end of the AM shift and beginning of the PM shift).  Assuming, *arguendo*, that Mr. Tucker spent the maximum of fifteen minutes after his AM shift at the institution, his one qualifying overtime activity, exchanging information, would still constitute a de minimis activity because his additional time at the institution includes time spent completing activities that were not "ordered" within the contemplation of *Doe*.  At least three minutes and twenty-one seconds of his claim time was spent walking from the Lieutenants' Office to the Control Center.  By then, Mr. Tucker had already relinquished his equipment and duties to his replacement and his principal activities were completed.  *See* 5 C.F.R. § 550.112(b).  Accordingly, after subtracting that time, the overtime work, including the wait for his replacement, ranged from eleven and a half minutes down to six and a half minutes. We find this time to be of a de minimis nature.

---

[34](...continued)
If the head of a department reasonably determines that a preshift or postshift activity is closely related to an employee's principal activities, and is indispensible to the performance of the principal activities, and that the total time spent in that activity is more than 10 minutes per daily tour of duty, he or she shall credit all of the time spent in that activity, including the 10 minutes, as hours of work.

Even if on rare occasions the exchange of information required more than ten minutes, the time is still de minimis.  The Federal Circuit has relied on factors other than the precise amount of time spent when considering whether an overtime claim is de minimis:  "(1) the practical administrative difficulty of recording additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the work."  *Bobo v. United States*, 136 F.3d 1465, 1468 (Fed. Cir. 1998) (quoting *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir. 1984)).  In *Bobo*, the court held that plaintiffs' duties and restrictions during their commute time were "infrequent, of trivial aggregate duration, and administratively impracticable to measure" and therefore were "de minimis . . . and consequently . . . noncompensable under the FLSA."  136 F.3d at 1468.[35]

We, therefore, must consider the administrative difficulty of capturing this overtime.  Someone would have to measure the amount of time between the end of the outgoing Lieutenant's shift and the end of the exchange of information and equipment, subtracting any time the lieutenants spent discussing anything other than work.  The measurement would have to be daily, because the length of the exchange varies by day.  The inefficiency and administrative difficulty of isolating and recording this time is apparent.

––––––––––––––––––––

[35]The Federal Circuit adopted these factors from *Lindow v. United States*, a Ninth Circuit case in which Army Corps of Engineers employees claimed that they performed FLSA overtime reviewing log books and exchanging information before their shifts.  738 F.2d at 1059-60.  Because these claims were based on the FLSA, the court had to apply a different analysis to the preliminary and postliminary work, based on the Portal-to-Portal Act.  The Ninth Circuit concluded:

> [A]lthough plaintiffs reported early on a regular basis, they did not regularly engage in compensable activities. The district court found that "most employees came in about 15 minutes early, and sometimes spent a portion of this time reading the log book or exchanging information."  Although plaintiffs' aggregate claim may be substantial, we conclude that their claim is *de minimis* because of the administrative difficulty of recording the time and the irregularity of the additional pre-shift work.

*Id.* at 1064.

30

Additionally, the occasions on which compensable overtime lasted beyond ten minutes would not be a daily occurrence.  As the Federal Circuit concluded in *Bobo*, we find Mr. Tucker's overtime "infrequent, of trivial aggregate duration, and administratively impracticable to measure."   136 F.3d at 1468.  Mr. Tucker's claim is per se de minimis.

CONCLUSION

For the reasons set forth above, we grant defendant's motion for summary judgment and deny plaintiffs' cross-motion.  The clerk is directed to enter judgment for defendant and dismiss the complaint.  No costs.

　　　　　　　　　　 s/ Eric Bruggink
ERIC G. BRUGGINK
Judge